**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

GREG CRAWFORD,

     Petitioner,

v.                            Case No. 8:22-cv-529-WFJ-CPT

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

**<u>ORDER</u>**

Greg Crawford, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent filed a response opposing the petition. (Doc. 13). Mr. Crawford filed a reply. (Doc. 15). After careful review, the petition is **DENIED**.

## I.    Background

In March 2013, Mr. Crawford—a 32-year-old man—engaged in sexual activity with a 15-year-old girl. (Doc. 14-2, Ex. 17, at 26, 38-42, 126). From April 2012 to February 2013, Mr. Crawford lived at Holy Ground, a homeless shelter in Hudson, Florida. (*Id.* at 73-75). The victim's aunt ran Holy Ground. (*Id.* at 63). Mr. Crawford would "talk" with the victim when she visited the shelter. (*Id.* at 28-30). In October 2012, about a month before her fifteenth birthday, the victim received a cellphone. (*Id.* at 30). At that point, she and Mr. Crawford began to communicate through phone calls and texts. (*Id.*) The two spoke "[e]very day." (*Id.* at 34).

1

Mr. Crawford repeatedly asked to visit the victim at her parents' house in Port Richey. (*Id.*) Without telling her parents, the victim eventually acquiesced. (*Id.* at 34, 36). Around midnight on March 14, 2013, the victim let Mr. Crawford in the house through the backdoor and led him to her bedroom. (*Id.* at 37-38). The two had vaginal and oral sex on the victim's bed. (*Id.* at 38). Mr. Crawford left the house around 4:00 a.m. (*Id.* at 40). He returned around midnight three days later, and the two again had vaginal and oral sex on the victim's bed. (*Id.* at 40-42). Mr. Crawford ejaculated during the second encounter; he did not ejaculate during the first. (*Id.* at 39, 42).

Around this time, Mr. Crawford and the victim exchanged several texts of a sexual nature. For example, the afternoon before the second incident, Mr. Crawford texted the victim, "We gotta settle for sneaky chill time n quiet sex." (*Id.*, Ex. 68, at 463). The victim responded, "Yeah I know. Lol." (*Id.*) Mr. Crawford wrote back, "QUIET . . . this time." (*Id.*) Later that day, Mr. Crawford texted the victim, "[I] like your tongue. . . . So soft n warm n wet . . . tho not as wet as . . . nvm." (*Id.* at 465-66). Three days later, Mr. Crawford wrote the victim, "So when we gunna make a porno lol." (*Id.*, Ex. 69, at 482).

On March 21, 2013, the victim's mother discovered the texts between her daughter and Mr. Crawford. (*Id.*, Ex. 17, at 61-62). The mother handed the cellphone to the victim's father, who then confronted the victim. (*Id.* at 44, 62). The victim told her father about the two encounters with Mr. Crawford. (*Id.* at 44-45). Her parents called the police later that day. (*Id.* at 45). When law enforcement arrived at the house, the mother handed the victim's bedsheets to a patrol officer. (*Id.* at 68-69, 79-80). The sheets had not been washed since the first sexual encounter with Mr. Crawford on March 14, 2013. (*Id.* at 68). Subsequent

2

DNA analysis revealed that the sheets contained Mr. Crawford's sperm as well as the victim's skin cells. (*Id.* at 152-57).

Law enforcement arrested Mr. Crawford and, after obtaining a *Miranda* waiver, interviewed him at the county jail. (*Id.* at 110). He denied having sex with the victim and claimed that he had never been inside her house. (*Id.* at 115-17). He admitted, however, to "talk[ing] to her on the phone," and he did not deny texting with her. (*Id.* at 112, 118-19). Indeed, Mr. Crawford claimed that he "[t]ext[ed] like that with everybody." (*Id.* at 119).

Mr. Crawford was ultimately charged with two counts of lewd or lascivious battery on a child 12 years of age or older but less than 16 years of age. (*Id.*, Ex. 14). Following a three-day trial, a jury found Mr. Crawford guilty as charged. (*Id.*, Ex. 18). After determining that he qualified as a habitual felony offender and a prison releasee reoffender, the trial court sentenced Mr. Crawford to 30 years' imprisonment.[1] (*Id.*, Ex. 25). Following an unsuccessful direct appeal, Mr. Crawford moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Exs. 37, 45, 46). The postconviction court summarily denied some claims; the remainder were denied after an evidentiary hearing. (*Id.*, Exs. 48, 49, 53, 54, 55). The appellate court affirmed the denial of relief. (*Id.*, Ex. 61). This federal habeas petition followed. (Doc. 1).

---

[1] At the time he committed his crimes, Mr. Crawford was on probation for grand theft and video voyeurism. (Doc. 14-2, Exs. 11, 12). Following his conviction for lewd or lascivious battery, the trial court revoked his probation and resentenced him to five years' imprisonment for grand theft and video voyeurism. (*Id.*, Ex. 20, at 19-20; *see also id.*, Exs. 33, 34).

## II.    Standards of Review

### A.    AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application

of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Mr. Crawford's convictions, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

### B. Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

5

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

### C.    Ineffective Assistance of Counsel

Mr. Crawford alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. Crawford must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Mr. Crawford must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

III.    **Discussion**

 A. **Ground One, Sub-Claim A—Advising Mr. Crawford Against Testifying at Trial**

Mr. Crawford contends that trial counsel provided ineffective assistance by advising him not to testify at trial. (Doc. 1 at 29). According to Mr. Crawford, counsel "urged [him] not to testify" because the "State's case was not strong and acquittal or a jury nullification was likely." (*Id.*) Counsel allegedly said that "if [Mr. Crawford] testified" the likelihood of an acquittal "would be slim to none as the[ ] [jury] would hear his [criminal] record and he would be impeached." (*Id.*) Mr. Crawford claims he would have testified that, at the time of the crimes, he was "living on the same property" as the victim's cousin, L.B., and that he "was sleeping with [L.B.]" (*Id.*) This allegedly "gave the victim and her family ready access to Mr. Crawford's bedding and/or DNA." (*Id.*) Mr. Crawford also says he would have testified that (1) he "had texted and talked to" L.B. on the victim's phone, (2) the victim obtained Mr. Crawford's number from L.B. "in order to convince him to date" L.B., (3) "just prior to these allegations there was a large argument involving [L.B.], Mr. Crawford, and [the victim]," and (4) on the day she revealed the relationship with Mr. Crawford, the victim "had gotten into trouble with [the] law and [her] family." (*Id.* at 30). In short, Mr. Crawford contends that his testimony would have shown that the victim "had motive for making [her] allegations as well as a means of providing fake evidence." (*Id.*)

The postconviction court held an evidentiary hearing on this claim. Mr. Crawford set forth the testimony he allegedly would have given at trial, including the points mentioned above. (Doc. 14-2, Ex. 54, at 9-10). He also claimed, however, that he had "slept

with [L.B.]" at the victim's house "about two weeks" before the first sexual encounter with the victim. (*Id.* at 9). Mr. Crawford stated that this testimony would have "explain[ed] [to the jury] why [his] DNA" was found on the victim's bedsheets. (*Id.*)

Counsel testified at the hearing as well. He said he advised Mr. Crawford against taking the stand because of the "damaging impeachment that would come out if he testified." (*Id.* at 34-35). First, Mr. Crawford likely would have been impeached with his prior felony convictions. (*Id.* at 31-32). Second, testimony about Mr. Crawford's sexual relationship with L.B., the victim's cousin, would have "open[ed] the door" to potentially damaging collateral-crime evidence. (*Id.* at 24, 29-30). At the time of trial, Mr. Crawford was facing a separate charge for unlawful sexual activity with a minor—L.B. (*Id.* at 24). The allegation was that Mr. Crawford had engaged in sexual relations with L.B. when she was 17 years old—a second-degree felony in Florida. (*Id.*, Ex. 51, at 671; *see also* Fla. Stat. § 794.05(1) ("A person 24 years of age or older who engages in sexual activity with a person 16 or 17 years of age commits a felony of the second degree.")). Thus, counsel was concerned that the prosecution would rebut any testimony about L.B. by presenting collateral-crime evidence about Mr. Crawford's sexual relationship with her.[2] (Doc. 14-2, Ex. 54, at 29-30). Third, counsel believed that, if Mr. Crawford testified to having sexual relations with L.B. in the victim's bedroom, he would likely have been impeached with his post-*Miranda* statements "denying ever being" in the victim's house. (*Id.* at 31).

---

[2] After his conviction in this case, Mr. Crawford pled guilty to unlawful sexual activity with a minor and received a sentence of seven years' imprisonment. (Doc. 14-2, Ex. 64, at 2).

Following the evidentiary hearing, the postconviction court rejected Mr. Crawford's ineffective-assistance claim in a written order. (*Id.*, Ex. 55, at 5). The court held that Mr. Crawford "ha[d] not rebutted the presumption that counsel's actions were reasonable." (*Id.*) The court explained that counsel "testified that he gave his opinion that [Mr. Crawford's] testimony would be less beneficial than impeachment would be harmful." (*Id.*) As the court noted, counsel "expressed concern that if [Mr. Crawford] were to testify, the State could, and most likely would, bring out damaging impeachment evidence," including collateral-crime evidence about "prior, similar" instances of sexual abuse. (*Id.*) Because "[l]imiting damaging evidence is a reasonable trial strategy," the court held that counsel was not deficient in advising Mr. Crawford against testifying at trial. (*Id.*)

The rejection of this claim was reasonable. "A criminal defendant has a fundamental constitutional right to choose whether to testify in his own defense." *United States v. Anderson*, 1 F.4th 1244, 1253 (11th Cir. 2021). "Where the defendant claims a violation of his right to testify by defense counsel, the essence of the claim is that the action or inaction of the attorney deprived the defendant of the ability to choose whether or not to testify in his own behalf." *United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir. 1992). "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *Id.* at 1533. "Moreover, if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify." *Id.* The touchstone of the analysis is whether "counsel's performance fell below an objective standard of reasonableness." *Id.* at 1534.

The postconviction court correctly concluded that counsel's advice not to testify was reasonable. Several strategic considerations weighed against Mr. Crawford taking the stand. If he had testified at trial, for example, the prosecution likely would have impeached him with his prior felony convictions. *See* Fla. Stat. § 90.610(1). "There are good tactical reasons why it may not be best for the defendant to testify in some circumstances," including "if the defendant might be prejudiced by revelation of prior convictions." *Teague*, 953 F.2d at 1533 n.9; *see also Brown v. Sec'y, Dep't of Corr.*, No. 8:09-cv-934-SDM-AEP, 2012 WL 2936167, at *6 (M.D. Fla. July 18, 2012) ("[P]reventing the disclosure of prior convictions that would prejudice the defendant is a sensible reason for advising against a defendant testifying."). Because the prosecution likely "would have impeached [Mr. Crawford] with [his prior] convictions, trial counsel was not ineffective for advising him not to testify." *Jenkins v. Sec'y, Dep't of Corr.*, No. 8:18-cv-1643-MSS-AAS, 2021 WL 3550881, at *9 (M.D. Fla. Aug. 11, 2021).

Furthermore, had Mr. Crawford testified that his sperm ended up on the victim's bedsheets because he had sex with L.B. in the victim's bedroom, he would have opened the door to collateral-crime evidence about his relationship with L.B. As noted above, at the time of trial, Mr. Crawford was facing a separate charge for unlawful sexual activity with L.B., who was 17 years old for at least part of their relationship. (Doc. 14-2, Ex. 51, at 671). Competent counsel could have concluded that Mr. Crawford's defense would suffer if the jury learned that he had committed a felony sex offense against another minor victim. *See McNeill v. Inch*, No. 20-cv-60612, 2021 WL 1222662, at *9 (S.D. Fla. Mar. 4, 2021) (holding that "counsel's decision not to pursue a defense [that would open the door

to collateral-crime evidence] was clearly a reasonable strategy"), *adopted by* 2021 WL 1215091 (S.D. Fla. Mar. 31, 2021); *Turner v. Sec'y, Dep't of Corr.*, No. 4:16-cv-43-MW-CJK, 2018 WL 7460600, at *12 (N.D. Fla. Nov. 19, 2018) (counsel not deficient for advising petitioner against testifying where "the State . . . could have elicited specifics of the prior allegations [of child sexual abuse] for purposes of impeachment if petitioner opened the door"), *adopted by* 2019 WL 956155 (N.D. Fla. Feb. 27, 2019). In any event, the prosecution likely would have impeached Mr. Crawford with post-*Miranda* statements in which he denied having been inside the victim's bedroom. (Doc. 14-2, Ex. 17, at 115-17).

For all these reasons, Mr. Crawford fails to establish that "no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020). Accordingly, his ineffective-assistance claim fails.[3]

## B.    Ground One, Sub-Claim B—Failure to Investigate and Call "Key Witness" at Trial

Mr. Crawford argues that trial counsel provided ineffective assistance by failing to investigate and call A.A. as a witness at trial. (Doc. 1 at 31-32). A.A. was friends with the

---

[3] In his petition, Mr. Crawford appears to allege that counsel mistakenly advised him that, if he testified at trial, the jury would learn not only "the number of [his] prior[]" convictions but also "information [about] them." (Doc. 1 at 29). Mr. Crawford did not, however, include this allegation in his Rule 3.850 motion. (Doc. 14-2, Exs. 45, 46). "[A] review of a state court adjudication on the merits in light of allegations not presented to the state court—for example, by examining additional facts or claims presented for the first time in a petitioner's federal habeas petition—would insufficiently respect the historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts." *Borden v. Allen*, 646 F.3d 785, 816 (11th Cir. 2011). Accordingly, this Court "do[es] not consider [Mr. Crawford's] supplemental allegations . . . when reviewing the reasonableness of the state court's resolution of this claim, which was based on the allegations before it." *Powell v. Allen*, 602 F.3d 1263, 1273 n.8 (11th Cir. 2010).

victim, and the two attended the same school. (Doc. 14-2, Ex. 51, at 664). According to Mr. Crawford, A.A. would have testified about a text exchange she had with the victim on March 15, 2013—the day after Mr. Crawford first had sex with the victim. (Doc. 1 at 33). During this exchange, the victim allegedly told A.A. that she had only "gone that far"— "meaning . . . had sex"—with a 17-year-old boy named A.J. who "attended her school." (*Id.*) Mr. Crawford contends that this testimony would have established that the victim was "not telling the truth" about having sex with him. (*Id.* at 34-35).

The postconviction court rejected this claim, finding that counsel was not deficient for failing to "investigate" or "call" A.A. as a witness. (Doc. 14-2, Ex. 48, at 8-9). The court did not decide whether Mr. Crawford satisfied *Strickland*'s prejudice prong. (*Id.*) In his petition, Mr. Crawford argues that the decision on the performance prong was unreasonable. (Doc. 1 at 33-34). The Court need not resolve that issue because, even under *de novo* review, Mr. Crawford cannot show that he was prejudiced by the failure to investigate or call A.A. at trial. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice and so we examine this element of the *Strickland* claim *de novo*."); *McKenzie v. Sec'y, Fla. Dep't of Corr.*, 507 F. App'x 907, 908 (11th Cir. 2013) ("[W]e need not decide if the state court's ruling [on the performance prong] was contrary to *Strickland* and therefore owed no deference under 28 U.S.C. 2254(d), because we cannot say on *de novo* review that [petitioner] has established that he received ineffective assistance of counsel as to the prejudice prong.").

"The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. Thus, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695-96.

Mr. Crawford cannot show "a reasonable probability that, but for counsel's [failure to investigate and call A.A. as a witness], the outcome at trial would have been different." *Reed*, 767 F.3d at 1261. The prosecution presented overwhelming evidence of Mr. Crawford's guilt. First, the victim testified that she had vaginal and oral sex with Mr. Crawford in her bedroom on March 14 and March 18, 2013. (Doc. 14-2, Ex. 17, at 37-42). Second, around the same time as the sexual encounters, the victim and Mr. Crawford exchanged numerous sexually explicit texts. For example, the afternoon before the second incident, Mr. Crawford texted the victim, "We gotta settle for sneaky chill time n quiet sex," and reiterated that they needed to be "QUIET . . . this time." (*Id.*, Ex. 68, at 463). Third, Mr. Crawford's sperm was found on the victim's bedsheets, which were recovered

by law enforcement only a few days after the second incident. (*Id.*, Ex. 17, at 76-79, 153-56).

In light of the overwhelming evidence of Mr. Crawford's guilt, there is no reasonable probability that A.A.'s testimony would have led to an acquittal. *See United States v. Andrews*, 953 F.2d 1312, 1327 (11th Cir. 1992) (rejecting ineffective-assistance claim based on failure to call exculpatory witnesses because, "even had the witnesses' testimony been presented to the jury, the verdict would have remained the same"). Had A.A. testified as Mr. Crawford suggests, the jury would have learned that the victim told her friend and schoolmate that she had engaged in sexual activity with a 17-year-old boy rather than Mr. Crawford—a 32-year-old man. The prosecution likely would have rebutted this testimony by arguing that the victim did not want to admit to her friend that she had had sex with a man over twice her age. Given this obvious alternative explanation—and in light of the strong evidence of his guilt—Mr. Crawford cannot show prejudice from the failure to present A.A.'s testimony at trial.[4] *See Bates v. Sec'y, Fla. Dep't of Corr.*, 768

---

[4] In his petition, Mr. Crawford claims that A.A. would also have testified that, on the same day the victim disclosed her relationship with Mr. Crawford, she had "gotten into serious trouble with both the law and her family for possessing . . . footage of [two] schoolmates having sex." (Doc. 1 at 33). But Mr. Crawford did not allege in his Rule 3.850 motion that A.A. would have offered this testimony. (Doc. 14-2, Ex. 46, at 10-15). Accordingly, this Court "do[es] not consider [Mr. Crawford's] supplemental allegations . . . when reviewing the reasonableness of the state court's resolution of this claim, which was based on the allegations before it." *Powell*, 602 F.3d at 1273 n.8. Even if Mr. Crawford had included these allegations in his Rule 3.850 motion, he would not be entitled to relief because he offers no evidence beyond his own unsupported assertion that A.A. would have testified as he suggests. *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."). Moreover, to the extent Mr. Crawford faults counsel for failing to call him as a witness at trial, the Court has already addressed this issue in its discussion of Ground One, Sub-Claim A.

F.3d 1278, 1300 n.9 (11th Cir. 2014) (noting that "[t]he overwhelming evidence of [petitioner's] guilt . . . makes it obvious that [he] cannot show *Strickland* prejudice").

## C.   Ground One, Sub-Claim C—Failure to Impeach Victim on "Critical Points"

Mr. Crawford contends that trial counsel rendered ineffective assistance by failing to impeach the victim on three "critical points." (Doc. 1 at 35). First, as noted above, the victim testified at trial that Mr. Crawford ejaculated during the second incident but not during the first. (*Id.*) Yet, according to Mr. Crawford, the victim stated in her "initial report to police" that he ejaculated during both incidents, and in her deposition "she claimed he ejaculated only [during] the first encounter." (*Id.*) Mr. Crawford believes that counsel should have impeached the victim on this "important detail[]." (*Id.*) Second, Mr. Crawford argues that counsel should have impeached the victim with her texts to her cousin, L.B., in which she "den[ied] having ever had sex" with him. (*Id.*) Third, Mr. Crawford maintains that counsel should have confronted the victim with her texts to A.A. in which she said that she had only engaged in sexual activity with a 17-year-old boy. (*Id.*)

As an initial matter, the Court has already explained why, even under *de novo* review, Mr. Crawford cannot show prejudice from the failure to introduce the victim's texts to A.A. The same analysis applies here. Accordingly, Mr. Crawford is not entitled to relief on his claim that counsel should have impeached the victim with her texts to A.A.

As for the other proposed avenues of impeachment, the postconviction court held that Mr. Crawford could not show prejudice from counsel's failure to pursue them. First, the court found that impeachment "concerning [the victim's] inconsistent statements about

16

[when Mr. Crawford] ejaculated" would "not have, in any significant way, impacted the credibility of the victim." (Doc. 14-2, Ex. 53, at 12). In the court's view, "[w]hether or not [Mr. Crawford] ejaculated during the first or second sexual encounter with the minor victim had no bearing on the issue of whether [he] committed lewd or lascivious battery." (*Id.*) Thus, "[e]ven if counsel had impeached the victim about exactly which time [Mr. Crawford] ejaculated during their sexual encounters, any such impeachment would not have negated the fact that the jury heard [other] testimony [and evidence] that supported the charge of lewd or lascivious battery." (*Id.* at 13). For that reason, the court ruled that Mr. Crawford "failed to demonstrate . . . a reasonable probability that the outcome of the trial would have been different had counsel impeached the victim on this issue." (*Id.* at 12).

Second, the court found no prejudice from counsel's failure to impeach the victim with her "prior statement" to L.B. that "she never had sex" with Mr. Crawford. (*Id.* at 13-15). The court reasoned that, "[e]ven if the jury had learned that the victim sent [L.B.] a text message denying a sexual relationship with [Mr. Crawford], that would do nothing to negate the other evidence that did in fact implicate [him] in this crime." (*Id.* at 15). As the court noted, "the nature of the text messages between [Mr. Crawford] and the minor victim indicated that he had engaged in [a] sexual relationship with the victim." (*Id.*) Moreover, Mr. Crawford's "DNA, in the form of his sperm, was found on the victim's sheets." (*Id.*) In light of this evidence of guilt, the court found no "reasonable probability that impeaching the victim on this issue would have resulted in an acquittal of [Mr. Crawford]—that is, a probability sufficient to undermine confidence in the outcome of the trial." (*Id.*)

The postconviction court acted reasonably in rejecting this claim. Mr. Crawford cannot show "a reasonable probability that, but for counsel's [failure to impeach the victim on these issues], the outcome at trial would have been different." *Reed*, 767 F.3d at 1261. As explained above, the prosecution presented overwhelming evidence of Mr. Crawford's guilt, including (1) the victim's own testimony, (2) the sexually explicit text messages between the victim and Mr. Crawford, and (3) the presence of Mr. Crawford's sperm on the victim's bedsheets. (Doc. 14-2, Ex. 17, at 37-42, 76-79, 153-56; *see also id.*, Ex. 68, at 463). Given the "substantial evidence of [Mr. Crawford's] guilt," "there is no reasonable probability the outcome of the trial would have been different had counsel impeached [the victim] in the manner suggested." *Thornton v. Sec'y, Fla. Dep't of Corr.*, No. 3:17-cv-64-MMH-JBT, 2019 WL 5268812, at *14 (M.D. Fla. Oct. 17, 2019).

Furthermore, the "impeachment value" of the victim's prior statements was relatively "weak." *Miller v. Sec'y, Dep't of Corr.*, No. 8:17-cv-2815-TPB-AEP, 2020 WL 7318967, at *28 (M.D. Fla. Dec. 11, 2020), *aff'd*, No. 21-10077, 2022 WL 3452468 (11th Cir. Aug. 18, 2022). Whether Mr. Crawford ejaculated during the first or second incident is a minor, legally irrelevant point. Thus, the failure to impeach the victim on this issue did not prejudice Mr. Crawford. *See Bradley v. Sec'y, Fla. Dep't of Corr.*, No. 17-12926-K, 2018 WL 3238836, at *9 (11th Cir. Apr. 2, 2018) ("The fact that trial counsel may not have highlighted every inconsistent minor detail in the victim's testimony did not [lead to] a reasonable probability of changing the trial's outcome."). Nor is there a reasonable probability that the jury would have acquitted Mr. Crawford had it learned that the victim told L.B., her cousin, that she never had sex with Mr. Crawford. In her deposition, L.B.

18

testified that the victim knew she (L.B.) had engaged in sexual activity with Mr. Crawford. (Doc. 14-2, Ex. 51, at 644). Thus, the prosecution likely would have argued that the victim had a strong motive to conceal her sexual relationship with Mr. Crawford from L.B.

For all these reasons, the postconviction court reasonably concluded that Mr. Crawford was not prejudiced by counsel's failure to pursue the proposed lines of impeachment. *See Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024) ("Applying AEDPA to *Strickland*'s prejudice standard, [this Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [the petitioner]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement.").

### D.   Ground One, Sub-Claim D—Failure to Object to "Improper Closing Arguments"

Mr. Crawford contends that trial counsel was ineffective for failing to object to the prosecutor's alleged comment during closing argument that the victim "was swooning over the attentions of an older man." (Doc. 1 at 36-37). A review of the trial transcript reveals that the prosecutor did not make this precise remark. But the prosecutor did say the following during his closing argument:

> Did she [the victim] have any interest in how the case is decided? There's no evidence that she did. She's 17 now. She was 15 then. *She was a starry eyed 15-year-old who fell in love with this guy twice her age* and now she's 17 years old and I would argue that common sense tells us that she didn't even want to come to court and testify in front of a bunch of strangers about these events that are manifested or obviously embarrassing that she snuck this guy into her parents' home and had sex with him on her bed in her parents' house while they were sleeping.

19

(Doc. 14-2, Ex. 17, at 206 (emphasis added)). Mr. Crawford argues that the prosecutor's "improper closing remark" was intended to "interject the prosecutor's feelings and create emotions in the minds of the jurors." (Doc. 1 at 37).

The postconviction court rejected this claim. It began by noting that, "contrary to [Mr. Crawford's] claim outlined in his sworn motion, there is no mention of the State arguing that the victim was 'swooning and star struck over the attention of an older man[]' during its closing argument." (Doc. 14-2, Ex. 48, at 12). Thus, the court held that Mr. Crawford could not "demonstrate that counsel was ineffective for failing to object to a statement that was never made." (*Id.*) Next, the court found that "even if [Mr. Crawford] could demonstrate that the statement was actually made, he would not be entitled to relief." (*Id.*) The court found no "reasonable probability" that "the outcome of the trial would have been different" "had counsel objected to [this] comment and had the judge admonished the jury that they were to disregard the comments." (*Id.*) The court explained that "the jury heard evidence that [Mr. Crawford's] DNA was . . . found on the victim's sheets." (*Id.*) As for Mr. Crawford's assertion that the prosecutorial remark "was made to 'create hostile emotions against [him] in the minds of the jurors,'" the court noted that "the jury also heard about the text messages between [Mr. Crawford], a 32-year-old man, and the victim, [a 15-year-old girl], some of which were explicit and sexual in nature." (*Id.*) Thus, the court concluded that, "even if the State had made the comment, given the nature of the evidence presented at trial, . . . this one comment [did not have] the impact [that Mr. Crawford] claim[ed]." (*Id.*) For that reason, Mr. Crawford "failed to demonstrate that counsel was ineffective." (*Id.*)

The rejection of this claim was reasonable. As an initial matter, the prosecutor did not expressly state that the victim was "swooning and star struck over the attention of an older man." (Doc. 14-2, Ex. 48, at 12). Thus, the postconviction court correctly held that counsel was not deficient for failing to object to a remark the prosecutor never made. *See Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008) (noting that "[a] lawyer cannot be deficient for failing to raise a meritless claim").

Mr. Crawford may have intended to refer to the prosecutor's comment that the victim "was a starry eyed 15-year-old who fell in love with this guy twice her age." (Doc. 14-2, Ex. 17, at 206). But the postconviction court reasonably concluded that counsel was not deficient for failing to object. "To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). "Attorneys are permitted wide latitude in closing argument, but that latitude does not extend to allowing improper argument." *Silvia v. State*, 60 So. 3d 959, 977 (Fla. 2011). "The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." *Id.* "A prosecutor is not limited to a bare recitation of the facts, but instead, may comment on the evidence and express the conclusions he contends the jury should draw from the evidence." *Crenshaw v. Sec'y, Fla. Dep't of Corr.*, No. 16-17735-D, 2017 WL 6761058, at *6 (11th Cir. Oct. 18, 2017) (citing *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984)).

There was nothing improper about the challenged remark. In context, it is clear that the prosecutor sought to argue that the victim was credible because she "didn't . . . want to

come to court and testify in front of a bunch of strangers" about her relationship with Mr. Crawford—a relationship in which she "was a starry eyed 15-year-old who fell in love with this guy twice her age." (Doc. 14-2, Ex. 17, at 206). That description of the relationship was amply supported by the trial record. For example, the victim testified that she had "strong feelings" for Mr. Crawford at the time they had sex. (*Id.* at 43). Likewise, the evening before she disclosed the relationship to the police, the victim texted Mr. Crawford, "Gn . . . love u . . ." (*Id.*, Ex. 69, at 478). "Although a prosecutor may not make an argument directed to passions or prejudices of the jurors instead of an understanding of the facts and law, there is no prohibition on colorful and perhaps flamboyant remarks if they relate to the evidence adduced at trial." *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997). Here, the challenged remark was "relate[d] to the evidence adduced at trial" about the victim's feelings for Mr. Crawford. *Id.* Based on that evidence, the prosecutor properly "express[ed] the conclusion[] he contend[ed] the jury should draw from the evidence"— namely, that the victim was a credible witness because she was willing to testify at trial despite the embarrassment she likely experienced from describing her relationship with Mr. Crawford. *Crenshaw*, 2017 WL 6761058, at *6. Because the prosecutor's remark was proper, counsel was not deficient for failing to object. *See Freeman*, 536 F.3d at 1233 (noting that "[a] lawyer cannot be deficient for failing to raise a meritless claim").

Furthermore, the postconviction court reasonably concluded that Mr. Crawford suffered no prejudice from counsel's failure to object. As explained above, the prosecution presented overwhelming evidence of Mr. Crawford's guilt. Thus, even if counsel had objected to the remark and the trial court had instructed the jury to disregard it, there is no

"reasonable probability" that "the outcome at trial would have been different." *Reed*, 767 F.3d at 1261; *see also Elrod v. Sec'y, Dep't of Corr.*, No. 8:11-cv-1777-JDW-MAP, 2014 WL 3687243, at *7 (M.D. Fla. July 24, 2014) (holding that, "[i]n light of the overwhelming evidence" of petitioner's guilt, he had "not shown a reasonable probability that the result of the trial would have been different had counsel objected to the [allegedly improper] comment").

### E.    Ground One, Sub-Claim E—Failure to "Subject the Case to Any Meaningful Testing."

Mr. Crawford argues that "[a]t no point did trial counsel act as a confrontational adversary to [the] State." (Doc. 1 at 12). According to Mr. Crawford, counsel "failed to subject the case to any meaningful testing" during either the "preparation" phase or the trial phase. (*Id.* at 7-8). Mr. Crawford contends that counsel's conduct entitles him to relief under *United States v. Cronic*, 466 U.S. 648, 659 (1984), which held that counsel is *per se* ineffective if he "entirely fails to subject the prosecution's case to meaningful adversarial testing." (Doc. 1 at 12).

The postconviction court rejected Mr. Crawford's claim, holding that "this case [did] not involve the situation required to create a *Cronic* violation." (Doc. 14-2, Ex. 48, at 13). The court explained that *Cronic* applies only where "the assistance of counsel has been denied entirely or withheld during a critical stage of the proceeding such that the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." (*Id.* (internal quotation marks and citation omitted)). For example, a defendant must show that "counsel was totally absent; was prevented from assisting the defendant during a critical

23

stage of the proceeding; or had a conflict of interest that impeded adequate representation." (*Id.* (internal quotation marks and citation omitted)). Applying these principles, the court held that Mr. Crawford did not "demonstrate that counsel failed to oppose the prosecution as a whole"; "he only claim[ed] counsel failed at certain points." (*Id.* at 14). Thus, "[b]ecause counsel was never denied," Mr. Crawford could not "rely on the *per se* rule from *Cronic*." (*Id.*)

The postconviction court correctly rejected this claim on the ground that *Cronic* was inapplicable. As relevant here, *Cronic* "applies only where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Castillo v. Fla., Sec'y of DOC*, 722 F.3d 1281, 1287 (11th Cir. 2013) (emphasis omitted). In other words, *Cronic* is "reserved for situations in which counsel has entirely failed to function as the client's advocate by failing to meaningfully oppose the prosecution's case." *Id.* (emphasis omitted). Thus, under *Cronic*, "counsel's failure to test the prosecution's case must be complete." *Id.* Here, counsel cross-examined several witnesses, lodged objections (including to the admission of the texts between Mr. Crawford and the victim), moved for a judgment of acquittal, and made both opening and closing arguments. (Doc. 14-2, Ex. 17). Counsel pursued the defense that the evidence was not "sufficient" to convict Mr. Crawford, arguing that (1) Mr. Crawford "unequivocal[ly]" denied any sexual relationship with the victim during his interview with law enforcement, (2) there was "no way of knowing what happened" to the victim's bedsheets before they were provided to law enforcement, (3) the prosecution failed to prove that Mr. Crawford "was at the other end of those texts," and (4)

the DNA evidence was suspect because the victim's skin cells were found on the sheets but Mr. Crawford's were not. (*Id.* at 217-20).

Because "counsel did not entirely fail to subject the prosecution's case to meaningful adversarial testing," *Cronic* is inapplicable here. *Castillo*, 722 F.3d at 1287; *see also Rogers v. Sec'y, Dep't of Corr.*, No. 8:17-cv-2680-VMC-SPF, 2019 WL 2646544, at *11 n.11 (M.D. Fla. June 27, 2019) (holding that "*Cronic* [was] inapplicable" because counsel "made opening and closing arguments, cross-examined witnesses, challenged the States' proposed jury instructions, moved for a judgment of acquittal, and made objections during the trial"), *aff'd*, 829 F. App'x 437 (11th Cir. 2020). Thus, the postconviction court correctly rejected Mr. Crawford's claim of *per se* ineffective assistance.

### F.    Ground Two—Alleged *Brady* Violation

According to Mr. Crawford, "[i]t is nearly certain" that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that DNA from a "third party" was allegedly located on the victim's bedsheets. (Doc. 1 at 39-40). Mr. Crawford does not cite any evidence to support this assertion. (*Id.* at 39-41). Instead, he relies entirely on the following trial testimony from the State's DNA expert:

> Q. When did you actually conduct the analysis of this requested evidence [*i.e.*, the DNA evidence]; do you recall that?
>
> A. Can I refer to my notes?
>
> Q. Sure. Specifically, I'm going to ask you about two different dates, one a sample of Gregory Crawford and the other a sample of [the victim] if that helps.
>
> A. Only those two samples?

Q. Only those two samples.

A. Right, correct. . . . I began the analysis on the buccal swab from Gregory Crawford [on] July 2, 2013.

(Doc. 14-2, Ex. 17, at 146). From this testimony, Mr. Crawford infers that "there [were] more than just two sets of DNA on the sheet[s]." (Doc. 1 at 39). In Mr. Crawford's view, the prosecution violated *Brady* by failing to disclose this allegedly exculpatory evidence. (*Id.* at 40-41).

Mr. Crawford raised his *Brady* claim on direct appeal, and the appellate court rejected it without explanation. (Doc. 14-2, Ex. 36, at 18-20; *id.*, Ex. 37). Thus, Mr. Crawford must "show[] there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. He cannot meet this burden.

"To prevail on a *Brady* claim, the defendant must establish: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the defendant incurred prejudice." *Wright v. Sec'y, Fla. Dep't of Corr.*, 761 F.3d 1256, 1278 (11th Cir. 2014). "The prejudice or materiality requirement is satisfied if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 746 (11th Cir. 2010). Of course, mere speculation about the existence of exculpatory evidence is insufficient to establish a *Brady* violation. *See United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011) ("[Defendant's] argument fails for a second reason: *Brady* applies only to exculpatory and impeachment evidence, and [defendant's] argument

that the report contains exculpatory information is, at best, speculative."); *see also Runningeagle v. Ryan*, 686 F.3d 758, 771 (9th Cir. 2012) ("As [defendant] can only speculate as to what [his co-defendant's former cellmate] told prosecutors, [defendant] cannot demonstrate that [the alleged] statements were exculpatory or useful for impeachment, or that there is a reasonable probability that had [the] statements been disclosed, the outcome of the trial or of the sentencing would have been different.").

Here, Mr. Crawford offers nothing beyond his own speculation to support his *Brady* claim. According to him, the prosecution withheld evidence that DNA from a "third party" was present on the victim's bedsheets. (Doc. 1 at 40). But Mr. Crawford has never presented any evidence to support this assertion. He points to an exchange between the prosecutor and the DNA expert during the latter's trial testimony, but that portion of the transcript does not show that a third person's DNA was found on the sheets. As noted above, the prosecutor stated: "I'm going to ask you about two different dates, one a sample of Gregory Crawford and the other a sample of [the victim] if that helps." (Doc. 14-2, Ex. 17, at 146). The expert responded, "Only those two samples?" (*Id.*) The prosecutor confirmed, "Only those two samples." (*Id.*) In context, it is clear that the prosecutor and the expert were referring to the buccal swabs obtained from Mr. Crawford and the victim— not the DNA samples collected from the sheets. (*Id.* at 146-53). Indeed, immediately after this exchange, the expert explained that she "began the analysis on the buccal swab from Gregory Crawford." (*Id.* at 146). Furthermore, nothing in the remainder of the expert's testimony (or in any other part of the record) suggests that a third person's DNA was found on the sheets. Mr. Crawford's "speculation that exculpatory information might exist is

insufficient to sustain a *Brady* claim." *United States v. Georgiou*, 777 F.3d 125, 141 (3d Cir. 2015); *see also United States v. Walsh*, 774 F. App'x 706, 707 (2d Cir. 2019) (defendant's "mere speculation that some exculpatory or impeachment material may have been withheld" insufficient to establish *Brady* violation).

### G.   Grounds Three, Five, Six, and Seven—Unexhausted Claims of Trial Court Error

Mr. Crawford argues that the trial court violated his federal right to due process by admitting the victim's bedsheets, which were allegedly "unauthenticated" and "inadmissible" (Ground Three); imposing a "vindictive" 30-year sentence in retaliation for Mr. Crawford's decision to go to trial (Ground Five); allowing the State's DNA expert to testify despite her failure to submit a "DNA report" before trial (Ground Six); and admitting a photograph of the victim that had been recovered from Mr. Crawford's cellphone (Ground Seven). (Doc. 1 at 42-43, 46-49).

Respondent correctly contends that Mr. Crawford failed to exhaust each of these claims. (Doc. 13 at 49, 54-56, 58). As for Grounds Three, Six, and Seven, Mr. Crawford raised these evidentiary issues on direct appeal, but he did not argue that the trial court's rulings violated the federal constitution.[5] Proper exhaustion requires a petitioner to "make the state court aware that the claims asserted present federal constitutional issues." *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007). "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition

---

[5] Mr. Crawford proceeded *pro se* on direct appeal after appointed counsel filed an *Anders* brief. (Doc. 14-2, Exs. 35, 36).

or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). In his appellate brief, Mr. Crawford failed to argue that the evidentiary issues in Grounds Three, Six, and Seven "present[ed] federal constitutional" questions. *Jimenez*, 481 F.3d at 1342; *see also* Doc. 14-2, Ex. 36, at 13-17. He did cite certain provisions of the Federal Rules of Evidence and the Federal Rules of Civil Procedure, but those citations were insufficient to raise a federal *constitutional* claim. *See Hartge v. McDonough*, 210 F. App'x 940, 943 (11th Cir. 2006) (citation of case "discuss[ing] evidentiary rulings under Rule 403 of the Federal Rules of Evidence" insufficient to exhaust claim "relying on federal constitutional law"); *Mackendrick v. Sec'y, Fla. Dep't of Corr.*, No. 14-14532-C, 2016 WL 11780232, at *3 (11th Cir. Sept. 15, 2016) (citation of "one federal case discussing the Federal Rules of Evidence" insufficient to "present[] a federal constitutional issue" on direct appeal).

As for Ground Five, Mr. Crawford did not raise the issue of vindictive sentencing in his brief on direct appeal. (Doc. 14-2, Ex. 36). Instead, following the completion of briefing, Mr. Crawford filed a supplemental memorandum arguing, for the first time, that "the presiding judge both vindictively and illegally sentenced" him. (*Id.*, Ex. 70, at 22). But the appellate court struck that document as "unauthorized," presumably because it was filed after the deadline to submit opening and reply briefs. (*Id.*, Ex. 71; *see also* Fla. R. App. P. 9.210(a), (g)). Presenting a federal claim in state court "in a procedural context in which its merits will not be considered" does not "constitute 'fair presentation'" and, therefore, does not satisfy the exhaustion requirement. *Castille v. Peoples*, 489 U.S. 346,

351 (1989). Mr. Crawford did not properly exhaust his vindictive-sentencing claim by attempting to raise it in his untimely supplemental memorandum. *See Wimbush v. Governor of Ga.*, No. 18-14465-D, 2019 WL 11863649, at *1 (11th Cir. Mar. 1, 2019) (holding that petitioner failed to "exhaust[] her state court remedies" because "she did not present her claims in a context where the state courts were empowered to decide them"); *Boyles v. Bowser*, No. 2:17-cv-01839-MO, 2022 WL 939824, at *7 (D. Or. Mar. 29, 2022) (finding claim unexhausted because, "[a]lthough Petitioner attempted to file a *Pro Se* Supplemental Appellant's Brief which contained a claim of prosecutorial misconduct . . . , the Oregon Court of Appeals specifically struck that brief and, therefore, did not consider the merits of any of the claims within it").

After his convictions were affirmed, Mr. Crawford filed a "motion for mitigation of sentence," arguing that his "sentence was only imposed due to the fact [that] he exercised his right to a trial." (Doc. 14-2, Ex. 43 at 1-2). The postconviction court construed this argument as a request for relief under Florida Rule of Criminal Procedure 3.800(a). (*Id.*, Ex. 44, at 2). It then rejected Mr. Crawford's claim on the merits. (*Id.* at 2-3). Crucially, however, Mr. Crawford never appealed the denial of relief. (*Id.*, Ex. 1). His failure to do so means that he did not properly exhaust his claim of vindictive sentencing through his postconviction proceedings. *See Boerckel*, 526 U.S. at 845 ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."); *Riley v. McNeil*, No. 8:05-cv-1944-JDW-EAJ, 2008 WL 5245990, at *4 (M.D. Fla. Dec. 16, 2008) ("To exhaust

the claims raised in his first two Rule 3.800(a) motions for post-conviction relief, [petitioner] was required to timely appeal the state trial court's orders denying relief.").

Mr. Crawford cannot return to state court to present his unexhausted claims in a second, untimely direct appeal or a successive Rule 3.800(a) motion. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within 30 days of the rendition of a sentence); Fla. R. Crim. P. 3.800(a)(2) ("A court may dismiss a second or successive [Rule 3.800(a)] motion if the court finds that the motion fails to allege new or different grounds for relief and the prior determination was on the merits"). As a result, Grounds Three, Five, Six, and Seven are procedurally defaulted. *See Smith*, 256 F.3d at 1138 ("If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established.").

Mr. Crawford offers no argument to excuse the default of Grounds Three, Six, and Seven. With respect to Ground Five—the vindictive-sentencing claim—he appears to contend that the default should be excused because he did not receive timely notice of the affirmance of his convictions on direct appeal. (Doc. 15 at 6). This argument lacks merit. "The 'cause' excusing the procedural default must result from some objective factor external to the defense that prevented the prisoner from raising the claim and which cannot be fairly attributable to his own conduct." *McCoy v. Newsome*, 953 F.2d 1252, 1258 (11th Cir. 1992). Here, the default resulted from Mr. Crawford's failure to raise the vindictive-sentencing claim in his brief on direct appeal. Any delay Mr. Crawford subsequently

experienced in receiving a copy of the appellate court's decision could not have "prevented [him] from raising the claim" in that brief. *Id.*

Mr. Crawford also argues that the default of Ground Five should be excused because "when his direct appeal was written/filed he was in county jail with no reasonable access to a law library or law clerk." (Doc. 16). Although inability to access a law library can in principle supply cause for a default, the petitioner must "specif[y] what materials he needed but could not get because of the lack of access to [the] law library." *Duncan v. Jones*, No. CA 13-0603-WS-C, 2014 WL 2155366, at *12 (S.D. Ala. May 22, 2014). Mr. Crawford does not describe the materials he needed but was unable to obtain from the law library, nor does he explain why his alleged inability to access the library prevented him from timely raising his vindictive-sentencing claim. Moreover, Mr. Crawford's "ignorance of the law as a *pro se* litigant and his inability to secure prison law clerk assistance do not constitute cause." *Francis v. Sec'y, Dep't of Corr.*, No. 8:15-cv-2205-CEH-AAS, 2018 WL 3093481, at *4 (M.D. Fla. June 22, 2018) (collecting cases).

In sum, Grounds Three, Five, Six, and Seven are unexhausted and procedurally defaulted, and Mr. Crawford offers no basis to excuse the default. Accordingly, these claims are barred from federal habeas review.

## H.    Ground Four—Admission of Text Messages Between the Victim and Mr. Crawford

Mr. Crawford maintains that the trial court violated his right to due process by admitting the texts messages between him and the victim. (Doc. 1 at 44). According to Mr. Crawford, the texts were "unauthenticated" and irrelevant; he also describes them as

inadmissible hearsay. (*Id.* at 44-45). Mr. Crawford raised this claim on direct appeal, and the appellate court rejected it without explanation. (Doc. 14-2, Ex. 36, at 6-7; *id.*, Ex. 37). Therefore, he must "show[] there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. Mr. Crawford cannot satisfy this demanding standard.

As an initial matter, the texts were plainly relevant. "Relevant evidence is evidence tending to prove or disprove a material fact." Fla. Stat. § 90.401. "In determining relevance, [courts] look to the elements of the crime charged and whether the evidence tends to prove or disprove a material fact." *Johnson v. State*, 991 So. 2d 962, 966 (Fla. 4th DCA 2008). Mr. Crawford was charged with lewd or lascivious battery, and the primary question at trial was whether he engaged in sexual activity with the victim. *See* Fla. Stat. § 800.04(4)(a) (defining offense of lewd or lascivious battery on a person 12 years of age or older but less than 16 years of age). As explained above, the texts between Mr. Crawford and the victim constituted powerful evidence that the two had engaged in a sexual relationship. To take just one example, the afternoon before the second sexual encounter, Mr. Crawford texted the victim, "We gotta settle for sneaky chill time n quiet sex." (Doc. 14-2, Ex. 68, at 463). The victim responded, "Yeah I know. Lol." (*Id.*) Mr. Crawford wrote back, "QUIET . . . this time." (*Id.*) These texts (and others presented at trial) were relevant because they "tend[ed] to prove . . . a material fact"—namely, that Mr. Crawford engaged in sexual activity with the victim. Fla. Stat. § 90.401.

Nor were the texts inadmissible hearsay. Florida law allows for the admission of "[a] statement that is offered against a party and is . . . [t]he party's own statement in either an individual or a representative capacity." Fla. Stat. § 90.803(18)(a). "Relevant, out-of-

court statements of a party opponent, [such as Mr. Crawford's text messages], are admissible in evidence . . . and thus are an exception to the hearsay rule." *State v. Elkin*, 595 So. 2d 119, 120 (Fla. 3d DCA 1992). Likewise, the victim's texts to Mr. Crawford were "admissible nonhearsay as context for the text messages that [Mr. Crawford] sent and were not offered to prove the truth of the matter asserted." *United States v. Bereznak*, 860 F. App'x 805, 809 (3d Cir. 2021); *see also United States v. Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016) (messages defendant "received were admitted not for the truth of the matter asserted but instead to provide context for [his] own messages." (emphasis omitted)).

Lastly, Mr. Crawford cannot obtain relief on his claim that the texts were not properly authenticated. As a threshold matter, "the Supreme Court has not established that questions of authenticity implicate due process." *Dickens v. Chapman*, No. 19-1945, 2020 WL 832900, at *2 (6th Cir. Jan. 15, 2020); *see also Hayes v. Lee*, No. 10-cv-5134-PGG-RLE, 2013 WL 4008638, at *8 (S.D.N.Y. July 30, 2013) ("The Supreme Court has never held that admission of evidence not adequately authenticated under state law is sufficient, in itself, to demonstrate a due process violation."). The absence of on-point precedent from the Supreme Court is fatal to Mr. Crawford's claim. *See Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1288 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law.").

Even apart from the absence of clearly established federal law, Mr. Crawford cannot show that the admission of the texts "failed the due process test of fundamental fairness."

34

*Dowling v. United States*, 493 U.S. 342, 352 (1990). Under Florida law, "[a]uthentication . . . of evidence is required as a condition precedent to its admissibility. Th[is] requirement[] . . . [is] satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fla. Stat. § 90.901. "[A]uthentication for the purpose of admission is a relatively low threshold that only requires a *prima facie* showing that the proffered evidence is authentic." *Lamb v. State*, 246 So. 3d 400, 408 (Fla. 4th DCA 2018). "Evidence may be authenticated by appearance, content, substance, internal patterns, or other distinctive characteristics taken in conjunction with the circumstances." *State v. Torres*, 304 So. 3d 781, 783 (Fla. 4th DCA 2020).

Here, the victim (1) identified Mr. Crawford as the person who sent the texts, and (2) testified that the "information" in the texts was "consistent with the information that [she] exchanged with Mr. Crawford back then," both through text messages and "actual voice phone calls." (Doc. 14-2, Ex. 17, at 48-49). This testimony was sufficient to authenticate the texts. *See Symonette v. State*, 100 So. 3d 180, 183-84 (Fla. 4th DCA 2012) (text messages authenticated where witness "identified the text messages between her and the defendant, and discussed the context of the messages"); *United States v. Arnold*, 696 F. App'x 903, 907 (10th Cir. 2017) (text messages authenticated where witness "testified that he received the original text messages from" defendant and "also testified as to the general time frame and the order of events that occurred when he received particular messages and groups of messages"); *United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) (text messages authenticated where witness "testified that [defendant] could send text messages from his cellphone, she had spoken to [defendant] on the phone number that

was the source of the texts, and the content of the text messages indicated they were from [defendant]").

## I.     Ground Eight—Cumulative Error

Finally, Mr. Crawford contends that the "accumulation of . . . errors" in his case "deprived [him] of his right to a fair trial." (Doc. 1 at 50). "Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). A cumulative-error claim "must fail," however, where none of the "individual claims of error" has "any merit." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Because each individual claim of error lacks merit, Mr. Crawford's cumulative-error claim necessarily fails.

## IV.    Conclusion

Accordingly, the Court **ORDERS**:

1.  Mr. Crawford's petition (Doc. 1) is **DENIED**.

2.  The **CLERK** is directed to enter judgment against Mr. Crawford and to **CLOSE** this case.

3.  Mr. Crawford is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Crawford

36

must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Crawford has not made the requisite showing. Because Mr. Crawford is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on September 17, 2024.

_____
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**